UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA       :

      -v-             :       S2 03 Cr. 1452 (LMM)

DAVID RUTKOSKE,          :

      Defendant,       :

------------------------------------------------------------x


## DAVID RUTKOSKE PRE-SENTENCING MEMORANDUM


Andrew G. Patel
Attorney for David Rutkoske
111 Broadway, Suite 1305
New York, NY 10006
212-349-0230

This memorandum is respectfully submitted in advance of the re-sentencing of David Rutkoske upon a remand from the Second Circuit Court of Appeal.  This matter was remanded when the Second Circuit held that an incorrect method was used to calculate the loss enhancement at the initial sentencing.  It is respectfully submitted that the government cannot establish a basis for a loss enhancement under the principles required by the Court of Appeals.

**Point I: Loss Enhancement Calculation**

A.   Initial Proceedings

On July 28, 2005, a grand jury sitting in the Southern District of New York returned a second superceding indictment charging David Rutkoske in two Counts with the crimes of conspiracy to commit securities fraud and securities fraud in violation of 15 U.S.C § 78j(b) and 78 ff; 17 C.F.R. § 240.10-5 and 18 U.S.C. § 2.

The indictment alleged that David Rutkoske was the President of Lloyd Wade Securities, a brokerage firm headquartered in Dallas, Texas with eight to ten branch offices around the country.  Lloyd Wade sold securities to the public and provided investment bank services for institutional clients.

The allegations concern the sale of the stock of an Internet gambling company, Netbet, which was publicly traded on the Over-The-Counter Bulletin Board.  The evidence at trial, upheld as sufficient by the Court of Appeals, was that from late 1996 through April 1999, the brokers at the New Jersey office of  Lloyd Wade used materially

1

misleading statements to sell shares of Netbet to the public to enable its employees to earn excessive undisclosed commissions. The government also introduced evidence that Lloyd Wade traders attempted to influence the price of Netbet shares. David Rutkoske proceeded to trial before a jury and the Honorable Richard C. Casey, late of this Court. On February 23, 2006, the jury found David Rutkoske guilty on both counts.

B.   Trial Evidence Relevant to Loss

Manuel Bello testified at trial pursuant to a cooperation agreement with the government. Mr. Bello testified that he signed the lease for the office space that would become the New Jersey Lloyd Wade Office of Supervisory Jurisdiction in January 1997. (Tr. 210)[1] Mr. Bello was effectively in charge of the Lloyd Wade New Jersey office and was the prime instigator and facilitator of the fraud at issue here. Prior to joining Lloyd Wade, Mr. Bello had learned about Netbet from a stock promoter and he brought Netbet to Lloyd Wade. (Tr. 223) Mr. Bello described Netbet as a company that did not have revenue[2] but that "had their networks and their computer infrastructure. They had software. They had the actual games, the internet games. They were in a testing phase with those." (Tr. 223)

The evidence concerning the ability of Mr. Bello's office's attempt to control the price of Netbet stock is as follows:

---

[1]      "Tr." refers to the trial transcript.

[2]      See expert report of Michael Clements, attached as Exhibit B, which finds that Netbet did have revenue. Id. at 6.

2

> Q.    Mr. Bello, before we talked, you mentioned the price you were
>
>        selling the stock at.  How did you choose the price that you were
>
>        selling Netbet to customers at?
>
> A.    It all depended on the prevailing market conditions and the supply
>
>        and demand from our brokers. (Tr. 247)

The trial evidence concerning the methodology used to determine the amount of

loss came from the testimony of Thomas Carocci. (Tr. 1019-1060) A number of exhibits

prepared by Mr. Carocci were introduced, including Government Exhibit 35-B, which is

attached as Exhibit A to this memorandum. Mr. Carocci testified that he is employed as

an attorney in the criminal prosecution assistance group at NASD [National Association

of Security Dealers] (Tr. 1020) Mr. Carocci testified that he reviewed both Blue Sheet

data and Trade Inquiry Reports for Netbet. (Tr. 1021-1022) To determine the amount of

loss, Mr. Carocci examined Blue Sheet data concerning Netbet from January 7, 1997

through July 29, 1999 (Tr. 1036), the last date for which Blue Sheet data for Netbet was

available. (Tr. 1037) Mr. Carocci determined the loss amount by determining the price at

which Lloyd Wade customers purchased Netbet stock and the price at which the

customers later sold the stock.  Mr. Carocci then reduced the amount of the loss by

determining the number of shares held by Lloyd Wade customers on July 29, 1999 (long

positions were approximately 2,560,650 shares), multiplying the number of held shares by

$.07, which was the closing price of Netbet on that day. (Tr-1038) Using this method, Mr.

3

Carocci determined that Lloyd Wade customers lost $12,340,548.06 trading in Netbet stock.

## C.   The Pre-Sentence Report

Prior to the initial sentencing, the United States Department of Probation prepared a Pre-sentence Report ("PSR") using the November 1, 1998 edition of the Guidelines (PSR ¶ 42; page 10.) The Guideline calculations in fraud cases begin by establishing the base offense level which is then enhanced according to a sliding scale related to a quantitatively measurable aspect of the offense. In fraud cases, the sliding scale for enhancement relates to the amount of loss attributable to the offense. As the loss increases, the guideline level increases as does the potential term of imprisonment.

In this case, the PSR applied level 6 as the Base Offense Level for security fraud. *See U.S.S.G. § 2F1.1(a) (1998)* The Department of Probation adopted the government's estimate that the offense conduct "caused customer losses of at least $10,000,000." (PSR ¶ 36; page 10) According to the sliding scale, the amount of the loss resulted in a 15-level enhancement. *See id. § 2F1.1(b)(1)(P)*. The PSR also applied a 2 level enhancement finding that it was a scheme to defraud more than one person, *see id. § 2F1.1(b)(2)*; 2 levels were added as this was a mass marketing scheme, *see id. § 2F1.1(b)(3)*; 4 levels were added for Mr. Rutkoske's role in the offense, *see id. § 3B1.1(a)*; and 2 levels were added for breach of a position of trust as the defendant was a registered stockbroker *see id. § 2B1.3*; for a total Adjusted Offense Level of 31 and a Criminal History Category of I

4

resulting in a Guidelines sentencing range of 108 to 135 months imprisonment.

D.   The Initial Sentencing

Mr. Rutkoske was sentenced by Judge Casey on August 15, 2006. At the sentencing, Judge Casey adopted guideline calculations in the PSR as being Level 31 and Criminal History Category I. Judge Casey found the loss amount to be over $12,000,000.00, the amount of loss determined by the Department of Probation based on the government's calculation. Judge Casey sentenced Mr. Rutkoske to a term of imprisonment of 108 months and ordered restitution in the amount of $12,057,928.00. Mr. Rutkoske filed a timely appeal to the Second Circuit Court of Appeals.

E.   Appeal in the Second Circuit

On appeal to the Second Circuit, David Rutkoske raised four issues: the statute of limitations, the sufficiency of the evidence, a challenge to the admissibility of evidence that had been introduced pursuant to Rule 404(b) of the Federal Rules of Evidence and the reasonableness of the sentence based on an incorrect method of determining the amount of the loss. In its decision, the Second Circuit held that the indictment was timely filed *United States v. Rutkoske,* 506 F.3d 170, 176 (2d Cir. 2007); that the evidence was sufficient to uphold the conviction on both counts on the misrepresentation theory, (id. 176), and that the evidence of other bad acts was properly introduced pursuant to Rule 404(b). *Id.* 178. The Second Circuit affirmed the conviction but held that Judge Casey had used an incorrect method to determine the amount of the loss. The matter was

5

remanded for re-sentencing.

## F.   Second Circuit Decision and Law of Loss Calculation

The Second Circuit held that after *United States v. Booker,* 543 U.S. 220 (2005)

which made the sentencing guidelines advisory, a sentencing court must correctly

calculate the guidelines. *See, United States v. Crosby,* 397 F.3d 103, 113 (2d Cir. 2005).

In calculating the loss enhancement in a criminal securities fraud case, the Second

Circuit rejected the government's method of determining the loss described above and

held that:

> considerations relevant to loss causation in a civil fraud case
> should ... apply, at least as strongly, to a sentencing regime in
> which the amount of loss caused by a fraud is a critical
> determinant of the length of a defendant's sentence. *Rutkoske,* at
> 179.

It is well established in this Circuit that to prevail in a civil securities fraud action,

a plaintiff must prove both transactional causation and loss causation. Transactional

causation is the "causal link between the defendant's misconduct and the plaintiff's

decision to buy or sell securities. Transactional causation can be established by showing

that, but for the claimed misrepresentations or omissions, the plaintiff would not have

entered into the detrimental securities transaction." *Emergent Capital Invest. Mgmt., LLC*

*v. Stonepath Grp, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003). Loss causation is the "causal

link between the alleged misconduct and the economic harm ultimately suffered by the

plaintiff." *Id.* 197. *See also Suez Equity Investors. L.P. v. The Toronto-Dominion Bank,*

6

250 F.3d 87, 96 (2d Cir. 2001); *Silver Top Limited v. Monterey Industries Inc,* 1995 U.S. Dist. LEXIS 462, (S.D.N.Y.. McKenna, J.) The Seventh Circuit, relying on the Supreme Court decision on *Dura Pharmaceuticals, Inc., v. Broudo*, 544 U.S. 336 (2005), held in *Ray v. Citigroup*, 482 F.3d 991, 994 (7th Cir, 2007), that "[i]f the plaintiff cannot prove "loss causation"–that is, the fact that the defendant's actions had something to do with the drop in value–then the claim must fail."

The factors to be considered in determining loss causation in a civil securities fraud matter are that the loss must be caused by the fraud as shown by the impact that the revelation of the fraud has on the market, that the amount of the loss be determined using an economic analysis and that loss be reduced by market factors other than the fraud that may have caused a drop in the value of the stock for reasons independent of the fraud. Under the principles related to loss causation, the appropriate method for determining loss that the Circuit determined should be applied in a criminal sentencing proceeding is as follows: First, determine the price of the stock at the time, or just before, the fraud is revealed. Second, determine how the price of the stock is impacted by the revelation of the fraud. Third, determine what other market factors may have caused a drop in the price of the stock.

The development and application of this method for determining loss enhancement in a securities fraud sentencing is evident from a review of the cases that the Second Circuit relied on when it remanded this matter.

7

In *Dura* the Supreme Court outlined the elements of a civil security fraud action as

(1) a material misrepresentation or omission; (2) scienter; (3) in connection with the

purchase or sale of a security; (4) reliance, often referred to as "transaction causation"; (5)

economic loss; (6) loss causation "a causal connection between the material

misrepresentation and the loss." *Id. 342.* The Supreme Court in *Dura* reversed a Ninth

Circuit decision holding that the loss occurred at the time the securities were purchased at

a price that was inflated due to the defendant's misrepresentations. The Court held the

purpose of the securities statutes was to "maintain public confidence in the marketplace"

"not to provide investors with broad insurance against market losses, but to protect them

against those economic losses that misrepresentations actually cause."*(Id. 345)*

  The government's method for determining the loss in this matter was rejected in

*Dura.*

> For one thing, as a matter of pure logic, at the moment the
> transaction takes place, the plaintiff has suffered no loss; the
> inflated purchase payment is offset by ownership of a share that
> *at that instant* possesses equivalent value. Moreover, the logical
> link between the inflated share purchase price and any later
> economic loss is not invariably strong. Shares are normally
> purchased with an eye toward a later sale. But if, say, the
> purchaser sells the shares quickly before the relevant truth
> begins to leak out, the misrepresentation will not have led to any
> loss. If the purchaser sells later after the truth makes its way
> into the marketplace, an initially inflated purchase price *might*
> mean a later loss. But that is far from inevitably so. When the
> purchaser subsequently resells such shares, even at a lower
> price, that lower price may reflect, not the earlier
> misrepresentation, but changed economic circumstances,
> changed investor expectations, new industry-specific or firm-

8

> specific facts, conditions, or other events, which taken
> separately or together account for some or all of that lower
> price. (The same is true in respect to a claim that a share's higher
> price is lower than it would otherwise have been--a claim we do
> not consider here.) Other things being equal, the longer the time
> between purchase and sale, the more likely that this is so, *i.e.*,
> the more likely that other factors caused the loss. *Id. 342-343*
> (emphasis in the original)

Following the principles outlined in *Dura*, the Circuit in *Rutkoske,* discussed

*United States v. Ebbers,* 458 F.3d 110, 128 (2d Cir. 2006), which held that the value of

the loss enhancement in stock fraud cases "must be the result of the fraud." *Ebbers*

concerned the fraudulent activities of Bernard J. Ebbers, the C.E.O. of WorldCom. Inc.

Prior to the bursting of the "dot-com bubble," WorldCom has been a successful company

with 90,000 employees in 65 countries, with reported revenue of $39 billion. With the

collapse of demand for WorldCom services, Ebber fraudulently manipulated the books of

WorldCom to hide the corporation's true financial condition. In March of 2002, the

Securities and Exchange Commission began an investigation of WorldCom. On June 25,

2002, WorldCom disclosed the fraud to the public. The price of WorldCom stock

collapsed, losing 90% of its value. WorldCom then filed for bankruptcy. *Ebber,* supra,

117. Ebber was indicted and convicted after trial of conspiracy to commit securities

fraud, securities fraud and related crimes.

Starting with the direction from the Guidelines that the sentencing court "need

only make a reasonable estimate of the loss" *U.S.S.G. § 2B1.1; Application Note 3 (1998)*,

the *Ebbers* Court considered a number of economic models for determining the loss, *id.*

9

126-128, and held that factors, other than the fraud, may have caused a decline in the price of the stock. "Losses from cause other than the fraud must be excluded from the loss." *Id. 128.* The *Ebber* court accepted the defense expert's opinion that factors including the abandonment of non-core business, the deferral or elimination of dividends are among a list of factors that were responsible for 35% of the decline in WorldCom stock immediately after the fraud was revealed to the public. The Court found that the losses caused by the fraud, even if the non-fraud caused losses were excluded, were so massive as to justify a 26 level loss enhancement under the guidelines, the highest loss enhancement permitted under the guidelines. *See also, United States v. Riga,* 583 F.3d 108, 120 (2d Cir. 2009) (even if all other market forces were considered, the loss in the value of Adelphia Communications Corp. shares caused by the defendants' fraud was so massive as to justify the greatest allowable loss enhancement under the guidelines.)

*United States v. Olis,* 429 F.3d 540, 547 (5th Cir. 2005) illustrates the economic principles that the Second Circuit requires to be employed in determining the loss enhancement under the Guidelines. In *Olis,* the defendant fraudulently manipulated $300 million, borrowed for a natural gas Dynegy Corporation transaction, appear to have been generated from positive cash flow. On April 25, 2002, the SEC required Dynegy to restate its cash flow and the price of the company's stock dropped.

Relying on the Supreme Court decision in *Dura,* the Fifth Circuit held that, in determining the loss:

10

> Useful guidance appears in the applicable principles for recovery of civil damages for securities fraud. The civil damage measure should be the backdrop for criminal responsibility both because it furnishes the standard of compensable injury for securities fraud victims and because it is attuned to stock market complexities. In civil cases, the principle of loss causation is well established. Thus, there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines. Where the value of a security declines for other reasons, however, such decline, or component of the decline, is not a "loss" attributable to the misrepresentation.

*Olis*, 429 F.3d at 546 (internal citations omitted.)[3]

The Ninth Circuit has also concluded that *Dura* requires the government to prove loss causation for criminal sentencing purposes. In *United States v. Zolp*, 479 F. 3d 715, 719 (9th Cir. 2007), the Ninth Circuit held that "the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." Thus, the essence of the error found by the Second Circuit in Mr. Rutkoske's original sentence was a failure to apply "a *realistic, economic approach* to determine what losses the defendant truly caused..." *United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001) (emphases in the original, internal quotations deleted)

---

[3]     The method to determine the loss employed by the Fifth Circuit in *Olis* and endorsed by the Second Circuit in its decision in this case is derived from the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b). *Olis* 429 F.3d at 546 n. 8.

Analysis

The date that the fraud was revealed to the market is an essential condition precedent to the determination of the economic loss. As noted by the Supreme Court in *Dura*, "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss" *Dura,* 544 U.S. at 342. "There is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines" *Olis, 429 F.3d at 546.*

At trial, in the Court of Appeals and in its sentencing memorandum to this Court, the government offers no evidence of the date the fraud was revealed to the market. "The Government provides no record citation to any particular date to support its generalized claim that the scheme 'unraveled.'" *Rutkoske,* 506 F.3d at 180. In fact, there is no evidence that the fraud was ever revealed to the market. Even the arrests in this case, which arguably were a public revelation of the fraud, did not occur until years after the last overt act charged in the indictment. By that time both Lloyd Wade and Netbet were out of business. The government has never offered an explanation of what ended the scheme charged in the indictment. The government offers no reason why the traders at Lloyd Wade ever stopped selling shares of Netbet. The government has not and cannot point to any evidence that the market ever learned of the fraud. It is therefore impossible for the government to establish the required economic basis for any loss enhancement in this matter.

12

Despite these economic missing links, the government attempted to calculate the loss in this matter based on the use of economically irrelevant dates. As noted above, the Court of Appeals rejected the date which the government expert employed to calculate the loss at the initial sentencing. That date, July 29, 1999, the last date Blue Sheet data was available for Netbet (Tr. 1037) is irrelevant to determining how the market reacted to the revelation of the fraud.

The dates the government employed in their submission to this Court fare no better. Applying the same methodology as was rejected by the Court of Appeals, the government uses the last date of an overt act listed in the indictment and a date somewhat later when the price of Netbet stock had gone up in the market.

In Exhibit A, the government calculates the loss as of April 9, 1999, the last day used for the conspiracy in the indictment. The government determined the loss to customers to be $12,102,396.53 which was reduced by $1,883,252.80 (the value 6,026,406 shares of Netbet held by Lloyd Wade customers at a closing price of $0.3125) with a resulting total loss of $10,219,144.73. According to the indictment, a sale of Netbet stock was made to a customer of Lloyd Wade on this date. Clearly, according to the government, the conspiracy was still on-going on April 9, 1999, and the alleged fraud had not been disclosed to the market. In economic terms, the date of April 9, 1999, is completely irrelevant.

May 14, 1999, the date used in Exhibit B attached to the government's sentencing

13

memorandum, is of no more economic relevance than any of the other dates selected by the government. There is no evidence that by May 14, 1999, that the fraud had been revealed to the market or that the conspiracy had ceased operation. In terms of economic analysis, the date of May 14, 1999, is as random as any other date the government could have selected. For reasons that the government makes no effort to explain, on May 14, 1999, the closing price of Netbet had rebounded to $0.37. Using the May 14, 1999 date, the government determined the loss to customers to be $12,089,221.59, which was reduced by $2,207,150.20 (the value 5,965,271 shares of Netbet held by Lloyd Wade customers at a closing price of $0.37) with a resulting total loss of $9,882,071.39.

It is respectfully submitted that by suggesting the use of these dates, the government is inviting this Court to repeat the error that resulted in this matter being remanded for re-sentencing.

Evidence of Netbet Trading

At the trial, the government introduced evidence of the price and trading volume of Netbet stock during the course of the conspiracy. The evidence is visually displayed in Government Exhibit 35-B which was prepared and testified to by Thomas Carocci, an attorney in the criminal prosecution assistance group at NASD. This Exhibit, attached as Exhibit A, charts the volume and price of NetBet shares.

According to Government Exhibit 35-B, which was prepared by the government, in January 1997, Netbet was selling for just over $5.00 per share. This is when the fraud

14

is alleged to have started. In March 1997, the price rose to $6.00 but the volume of stock sales declined. In July 1997, the price dropped to an average of $2.00 per share and the volume of sales rose to over 500,000 per month for the first time. After July, the price began to rise, reaching a high of $6.00 per share in November 1997. As the price rose from July through November 1997, the volume dropped.

With the exception of March 1998, May 1998, and June 1998, the chart displays a consistent pattern which is that as the price of Netbet stock dropped, the volume of sales increased. This pattern shows a classic market reality that investors are willing to assume a risk if the price is low but they are less inclined to accept a risk if the price is high. From an economic perspective, this government exhibit shows a basic market truism and not evidence of fraud.

The government contended that the traders at Lloyd Wade were able to control the price of Netbet shares. Government Exhibit 35-B does not support that contention. The chart shows a pattern of low volume sales at high prices and higher volume sales at lower prices. The exhibit confirms Mr. Bello's testimony that the price of Netbet "depended on the prevailing market conditions." (Tr. 247)

The only valid conclusion that can be drawn is that this "fraud" failed to alter market conditions. The evidence introduced by the government clearly indicates that the "prevailing market conditions" discussed below overwhelmed the effects of any fraud.

15

Netbet Was Not a Worthless Company

To avoid the consequences of its inability to establish a factual basis for an

economic loss, the government argues that the Netbet was a worthless company and that

Lloyd Wade was selling worthless stock. (Gov. Sentencing Memo at pages 10-12) This

argument has been universally rejected. Factually, the evidence from the trial quoted on

page 2 above, indicates that Netbet was a real company. As to the findings of the District

Court, the Court of Appeals explicitly stated that:

> The record does not suggest that the District Court understood
> Lloyd Wade to have "promoted worthless stock in worthless
> companies," which would justify attributing the entire loss
> amount to Rutkoske's fraud. *Rutkoske Fnt. 4*

The Court of Appeals did not conclude that Netbet was a worthless company. If it

had found Netbet to be worthless, it would not have remanded the matter for re-

sentencing. This conclusion is evident from the Circuit's citation to the following

language in *Olis*, supra.

> In cases where defendants promoted worthless stock in
> worthless companies, measuring the loss as the entire amount
> raised by the schemes is neither surprising nor complex, and is
> fully consistent with civil loss causation. *Id. 546.*

Finally, the government itself does not believe that Netbet was a worthless

company. The government's expert at trial calculated the loss by determining the price

Lloyd Wade customers paid for shares of Netbet. He then reduced that amount by the

value of the shares of Netbet held by Lloyd Wade customers on the date he selected. In

16

their submission to this Court, the government also calculated the loss by determining the purchase price of Netbet shares and then reducing that figure by the value of Netbet shares held by Lloyd Wade customers on the economically irrelevant dates that the government chose to employ. On each occasion, the government calculated the loss by reducing the purchase price by a figure that was determined by multiplying the number of shares held by Lloyd Wade customers by the closing price for Netbet on the date selected. Had the government believed that the evidence established that Netbet as a company and the shares in Netbet had been worthless, no such credit for the customers' long position would have been made by the government. It is equally certain that the government believed that the shares of Netbet had value on each of the dates that they used to calculate the loss.

The government argues to this Court that the guidelines require a reasonable estimate of the loss. That is a correct statement of the law but the government then urges this Court to ignore the methodology that is required to make that reasonable estimate of the loss. The government reliance on *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008), for the proposition that "in cases involving fraud, "a district court may presume that the defendant intended the victims to lose the entire face value of the [fraudulent] instrument, but the defendant may rebut the presumption by producing evidence to demonstrate that he actually intended to cause a lesser loss." Gov Brief at 9. *Confredo* concerned the determination of a loss in a bank fraud case where the defendant

17

coordinated the submission of over 200 fraudulent bank loan applications. In *Rutkoske*, the Second Circuit instructed that the method for determining loss in a criminal securities fraud case should be the method used to determine loss in a civil securities fraud case. The government does not cite to not a single case that holds that the method for determining loss in a bank fraud case would be appropriate to apply in a civil securities fraud case . It would be difficult to imagine what market factor (an element that must be considered in determining loss in the realm of securities fraud) could reduce the loss in a bank fraud case.      The government's reliance on *United States v. Leonard,* 529 F.3d 83 (2d Cir. 2008), is equally unavailing. *Leonard* concerned the determination of loss in a case involving the fraudulent private sale of shares of companies formed to finance the production and distribution of motion pictures. "We are mindful that illiquid securities for which there is no public market can be extremely difficult to value." *Id. 91* There is a difference between a "thin market" and "no market". There was a market for Netbet shares. Government Exhibit 186 (Netbet, Inc., May 6, 1998, Information and Disclosure Statement of SEC Rule15c2-11(a)) lists 10 brokerage firms, in addition to Lloyd Wade, that made a market for and traded in Netbet shares.

    The government's reliance on *Leonard* suggests that the government misapprehended the essence of the Second Circuit's decision in this case. The core holding of the Circuit's opinion was that the method to determine the loss that is routinely applied in civil securities fraud should be used to determine the loss for sentencing

18

purposes in criminal securities fraud cases. The Circuit did not suggest that it would be

appropriate to apply this methodology in other forms of criminal fraud cases. The

presence of a market distinguishes criminal security fraud cases from other types of

criminal frauds. See *Basic Inc., v. Levinson*, 485 U.S. 224, 244 (1988) ("the market is

performing a substantial part of the valuation process performed by the investor in a face-

to-face transaction.") The Second Circuit merely directed that in criminal securities fraud

cases that the loss be determined in light of "valuation process" of the market. As

discussed above, there is no evidence that the market ever learned of or evaluated the loss

in this case. The government's reliance on *Leonard,* which concerned face-to-face

transactions as opposed to a market transactions, is misplaced.

Additionally, the government's reliance on *Leonard* is little more that a redressing

of the "thin" market argument that the Court of Appeals rejected.

> The Government contends that it satisfied whatever obligations
> *Dura Pharmaceuticals*, *Ebbers*, and *Olis* impose by showing
> that NetBet shares traded in a "thin" market and that "the
> scheme unraveled, and the price of NetBet stock plummeted."
> However, a "thin" market does not preclude the effect of market
> forces, although it may minimize them, and the Government's
> expert linked the low share price of his calculation to an
> arbitrary date representing the end of available blue sheet data,
> rather than the date of disclosure of the fraud. The Government
> provides no record citation to any particular date to support its
> generalized claim that the scheme "unraveled." *Rutkoske,* at
> 180.

As this argument was made, considered and rejected by the Court of Appeals, the

government is precluded from making that argument here under the Law of the Case

19

doctrine. "The law of the case ordinarily 'forecloses relitigation of issues expressly or

impliedly decided by the appellate court.'" *United States v. Quintieri*, 306 F.3d 1217,

1229 (2d Cir. 2002) (quoting *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001)).

Unable to establish an economic basis for a loss enhancement, the government

nevertheless seeks a sentence based, not on the economic loss caused by the fraud, but

rather based on the purchase price of the stock. In so doing, the government seeks to use

the securities law as insurance for investors, a concept that was explicitly rejected by the

Supreme Court in *Dura*. ([The securities] "statutes make these latter actions available, not

to provide investors with broad insurance against market losses, but to protect them

against those economic losses that misrepresentations actually cause." *Id. 345*)

Other Market Factors

The Internet, which is now an integral part of our daily lives, was in its infancy in

1996. The World Wide Web came into existence in 1992, and e-commerce was a new

creature in 1996. At that time there were approximately 200 companies entering the

Internet gambling business. As with any industry, some new entrants to the business are

successful and some are not.

It is difficult and inappropriate to evaluate Internet companies according to the

same standard as might be applied to what are often referred to as brick-and-mortar

businesses. For example, e-commerce does not necessarily require the ownership or

construction of factories, warehouses, and maintenance of inventory or of a distribution

system.  Nor does e-commerce require many of the fixed assets that are identifiable and

quantifiable assets associated with a brick and mortar company. This is particularly true

of an Internet casino where all that is required is the software to allow patrons to engage

in games of chance and a method to electronically pay patrons who win bets and collect

from patrons who lose. Netbet had those assets. Netbet was a real company, operating a

real Internet casino, accepting real bets and generating real revenues.  As discussed in the

accompanying report of Michael Clements, a copy of which is attached as Exhibit B (the

"Clements Report"), Netbet's ultimate demise has more to do with market factors and the

potential of devastating negative regulation by the United States government than it has to

do with the fraud involved in this case.

     Internet gambling did not receive a warm welcome from the United States

government.  Threatened regulations and prosecutions had a negative impact on the

market which had a far greater impact on the price of Netbet shares than any influence

that may have been asserted by the traders at Lloyd Wade.

     In 1997, Senator Jon Kyl of Arizona introduced the Internet Gambling Prohibition

Act.  Although it was not enacted, the chilling effect on the market by the introduction of

this legislation was undeniable.  After this bill was introduced, the price of Netbet shares

fell from approximately $6.00 per share to $1.25 per share within a few months.  See

Clements Report at 6.

     In March of 1998, Jay Cohen, the President of World Sports Exchange, a wholly

unrelated Internet based sports betting company, was arrested, indicted and convicted by prosecutors in the Southern District of New York.  His conviction and sentence of 21 months imprisonment was affirmed.  *United States v. Cohen,* 260 F.3d 68 (2d Cir. 2001).  This highly publicized prosecution also had a chilling effect on the market for Netbet shares.

Mr. Clements concludes that 50% to 75% of the decline in the price of Netbet shares was caused by the efforts of the United States to criminalize Internet gambling legislatively and the prosecution of individuals working for Internet gambling companies.  Clements Report at 6.  The balance of the decline of Netbet shares was caused by the dramatic rise in the Dow Jones Industrial Average.  As a result of the rise of the Dow, the shares of more established companies on more established exchanges out performed companies such as Netbet.  As a result, viable companies such as Netbet were less able to attract investors due to their lower returns.

Conclusion

The Court of Appeals remanded this matter for re-sentencing so that the amount of the loss could be calculated in accordance with the method outlined in its opinion.  That method required the sentencing court to determine the economic loss caused by the fraud by determining the impact the revelation of the fraud had on the market and the considering of other market factors that might have caused a reduction in the value of the stock which are independent of the fraud.

22

The evidence here is that the fraud was never revealed to the market until years after it ended, if ever. The evidence also shows that the fraud was an economic failure. The trading pattern of the stock does not reflect fraudulent activity, rather it establishes only a normal trading pattern, volume goes up as prices go down. Finally, the market forces, primarily instigated by the United States government, had a major negative impact on the price of Netbet stock.

It is respectfully submitted that the government has not and cannot establish "a *realistic, economic approach* to determine what losses the defendant truly caused..." *United States v. West Coast Aluminum Heat Treating Co.,* 265 F.3d 986, 991 (9th Cir. 2001)(emphases in the original). The evidence introduced at trial, viewed in a light most favorable to the government, establishes that investors purchased Netbet shares through Lloyd Wade brokers who made material misrepresentions. There was no evidence introduced at trial or proffered by the government to suggest, much less prove, that anyone at Lloyd Wade did anything that caused the drop in Netbet shares. The evidence was that the traders at Lloyd Wade attempted but failed to raise the price of Netbet shares. In short, the government is "confusing loss causation,...with transaction causation." *Ray,* 482 F.3d at 995.

The fact that the government cannot prove that the fraud caused a loss does not mean that David Rutkoske will escape punishment. He has already served 21 months in prison as the result of his conviction in this matter. The government's failure to prove an

23

economic loss merely means that Mr. Rutkoske will not be facing an enhancement based on a proven economic loss. As Judge Posner wrote: "The government did not earn the bonus points in this case." *United States v. Cox,* 930 F.2d. 555, 559 (7th Cir. 1991).

Without the 15 level enhancement for loss, and assuming no other changes to the guideline calculations (see argument below), the final correctly calculated guideline level is Level 16. At Criminal History Category I, the resulting advisory sentencing range would be 21 to 27 months, a sentence which Mr. Rutkoske has effectively served.[4]

In this case the government brought an indictment charging Mr. Rutkoske with a violation of the securities laws of the United States. He was tried before a judge and a jury which convicted him. The Court of Appeals held that there was sufficient evidence to establish his guilt beyond a reasonable doubt. It is disquieting to realize that had this action been brought by the customers of Lloyd Wade for a violation of the same statutes in a civil proceeding for damages where the proof need only be established by a preponderance of the evidence, that law suit would almost certainly have been dismissed either on a pretrial motion for summary judgment or on a motion for a directed verdict at the end of the plaintiff's case for a failure to sufficiently allege loss causation. *See, Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005)*; First Nationwide Bank v.*

---

[4]     David Rutkoske was sentenced on August 15, 2006. Mr. Rutkoske self-surrendered to begin his sentence on October 26, 2006. He was released on bail by Order of this Court 18 months and 27 days later on May 23, 2008. Under Bureau of Prison regulations, Mr. Rutkoske would receive approximately 86 days of "good time" credit. Mr. Rutkoske has therefore effectively served a sentence in excess of 21 months.

24

*Gelt Funding Corp,* 27 F.3d 763 (2d Cir. 1994).

It is respectfully requested that you Honor impose a sentence of no longer than the time Mr. Rutkoske has already served.[5]

## Point II: Role In the Offense

At the initial sentencing, Mr. Rukoske's offense level was raised 4 levels due to his leadership role in the offense. The enhancement for role in the offense was objected to prior to the sentencing before Judge Casey. The issue of the role in the offense was not raised on the appeal. As this issue could have been raised on appeal but was not, its consideration now raises a potential Law of the Case issue. "The law of the case ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court. It ordinarily prohibits a party, upon resentencing or an appeal from that resentencing, from raising issues that he or she waived by not litigating them at the time of the initial sentencing." *United States v. William*, 475 F.3d 468, 475 (2d Cir. 2007 (internal quotations omitted) However, the Law of the Case doctrine permits a court to reconsider an issue when "the need to correct a clear error of law or to prevent manifest injustice." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009); *United States v. Minicone*, 26 F.3d 297, 300 (2d Cir. 1994). It is respectfully submitted that enhancing David Rutkoske's sentence based on his role in the offense would be a manifest injustice

---

[5]     As the government cannot establish a loss "sustained by each victim as a result of the offense"18 U.S.C. § 3663(a)(1)(B)(i)(I), it is respectfully submitted that an Order of Restitution should not be entered as to Mr. Rutkoske.

25

and it is therefore appropriate for this Court to consider the role in the offense issue on re-sentencing.

Guideline section 3B1.1 states: "Based on the defendant's role in the offense, increase the offense level as follows: (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The PSR gave a 4 level enhancement for David Rutkoske's role in the offense. The PSR's rationale for this enhancement was that "the defendant was the president of the entire company and had many brokers working for him on this fraud, four levels are added pursuant to §3B1.1(a))." (PSR ¶ 53; page 11.) It is respectfully submitted that this enhancement for role in the offense was added in error.

Under Second Circuit case law, the owner of a corrupt company can have his sentenced enhanced for a leadership role in the offense but none of those cases support such an enhancement in this case. *United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)(defendant was President of company that made corrupt political payoffs, evidence that defendant was directly involved in dispensing some payments and favors); *United States v. DeRiggi*, 72 F.3d 7 (2d Cir. 1995) (defendant was supervising inspector in a New York City Taxi and Limousine Commission inspection station where bribes were regularly accepted. Defendant's sentence was enhanced for leadership role due to his control of the inspection station and his participation in the scheme.); *United States v. Wisniewski*, 121 F.3d 54 (2d Cir. 1997) (defendant was owner of car dealership that sold

26

cars to drug dealers for cash by means designed to avoid reporting cash transactions. Defendant actively participated in the crime, played a day-to-day role in the conspiracy, hired and supervised other co-conspirators and was the principal beneficiary of the crime.); *United States v. Escotto*, 121 F.3d 81 (2d Cir. 1997), (the scheme consisted of three "boiler room" companies that defrauded mostly elderly people. Defendant was part owner of all three companies, managed two of the companies, signed payroll checks for one of the companies, helped hire salesmen, provided leads and trained employees); *United States v. Kilkenny*, 493 F.3d 122 (2d Cir. 2007)(defendant received leadership enhancement due to the fact that he supervised the company bookkeeper who prepared false documents used in defendant's bank fraud.)

Other Circuits have distinguished between a defendant's role in the corporate hierarchy and his role in the offense. In *United States v. DeGovanni*, 104 F.3d 43 (3rd Cir. 1997) the Third Circuit held that a police sergeant who was the supervisor of a group of police officers who assaulted and seized money from suspected drug dealers, made arrests without probable cause, conducted illegal searches and fabricated evidence, should not have his sentence enhanced for having played a leadership role in the offense. DeGovanni participated and profited from the illegal activity but claimed that, while he was a supervisor within the Police Department, he was a rank and file member of the conspiracy. The Third Circuit found that the "defendant's role *in the criminal activity* is the operative issue." (emphasis in the original) Id. 46, and held that for a defendant's

27

sentence to be properly enhanced for leadership in the offense, the defendant must "have an active supervisory role *in the actual criminal conduct* of others to justify the enhancements contained in this section [3B1.1] of the Guidelines."(emphasis in the original) *Id.*46.

In *United States v. Litchfield*, 959 F.2d 1514, 1521 (10th Cir. 1992), the defendant was the leader of a gold mining operation that was marketed by fraudulent means. The district court found that the defendant was essential to the success of the fraud and enhanced his sentence for having played a leadership role in the offense. The Tenth Circuit remanded for re-sentencing. The Tenth Circuit found that "[a]lthough defendant may have recruited unwitting investors, he did not recruit accomplices. Defendant did not control distribution of the profits; nor does it appear that he took a larger division of the profits. Defendant did not exercise decision making authority over his coconspirators." *Id.* 1523. Accordingly, the defendant was held not to qualify for an enhanced sentence as a leader of the offense.

The facts of the instant are more in line with the Third Circuit decision in *DeGovanni* and the Tenth Circuit decision in *Litchfield* then with the line of Second Circuit cases outlined above. It is true that Mr. Rutkoske entered into an agreement with Manuel Bello and Benjamin Conde for them to operate an Office of Supervisory Jurisdiction in New Jersey. This office was in effect a franchise office in which Mr. Rutkoske had no role in the day-to-day operations of the office. In the more than 2 years

28

that the New Jersey office was in operation, the evidence at trial established that David

Rutkoske visited that office approximately 5 times. The evidence is unequivocal that, on

Mr. Rutkoske's first visit, all evidence of improper activity was stopped due to Mr.

Rutkoske's presence. The evidence is more equivocal about what was going on during

his brief subsequent visits. There was no evidence that Mr. Rutkoske participated in the

sale of a single share of Netbet stock, that he hired a single broker or cold caller who

worked in the New Jersey office, that he provided a single lead to a potential customer or

that he trained any of the people who worked in the New Jersey office.

The trial evidence also establishes that Mr. Rutkoske did not receive any personal

financial benefit from the sales of Netbet shares. It is true that Lloyd Wade Securities did

receive payments from these sales but at a much smaller level than any of the other

participants.

Application Note 4 to Guideline Section 3B1.1 states, in relevant part, that in

determining if a defendant had a leadership role in the offense, the "factors the court

should consider include the exercise of decision making authority, the nature of

participation in the commission of the offense, the recruitment of accomplices, the

claimed right to a larger share of the fruits of the crime, the degree of participation in

planning or organizing the offense, the nature and scope of the illegal activity, and the

degree of control and authority exercised over others."

Applying those factors to this case requires the conclusion that it would be

29

improper to enhance Mr. Rutkoske's sentence based on his role in the offense. Mr. Rutkoske's decision making authority was on the corporate level and he had no decision making authority in the day-to-day operation of the New Jersey office. Mr. Rutkoske did not recruit, hire or train any of the people who worked in the New Jersey office. When improper actions were brought to his attention by his compliance officer, the offending individual was fired at Mr. Rutkoske's direction. Lloyd Wade received a standard percentage of the sales of the New Jersey office. Of all the people involved, Lloyd Wade received the smallest percentage. As noted above, except for his corporate role (primarily signing checks) Mr. Rutkoske was not present, nor did he participate in the making of misrepresentations to investors.

While Mr. Rukoske was the President of Lloyd Wade Securities, he did not play a leadership role in the offense. It is respectfully submitted that it would be inappropriate to enhance Mr. Rutkoske's sentence pursuant Guideline section 3B1.1.

## Point III:18 U.S.C. 3553(a) Factors

Prior to Mr. Rutkoske's sentencing before Judge Casey, numerous letters were submitted to the Court concerning his history and character. Prior counsel made arguments concerning sentencing factors to be considered in formulating an appropriate sentence for Mr. Rutkoske. We respectfully adopt and incorporate those letters and arguments here. There is however, an additional factor which it is respectfully submitted should be considered in sentencing Mr. Rutkoske. That factor is the impact the returning

of Mr. Rutkoske to prison would have on his young children, especially on his learning

disabled son.

Relevant Case Law

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245-246

(2005) rendered the federal Sentencing Guidelines advisory, thereby changing "the

decision-making process of every district judge in determining every sentence." *United*

*States v. Crosby*, 397 F.3d 103, 116 (2d Cir. 2005). *Booker* and the subsequent case law

have returned to trial judges the authority to impose sentences that are, according to

§3553(a), "sufficient but not greater than necessary, to comply with the purposes [of

sentencing] set forth in" §3553(a)(2). *Simon v. United States*, 361 F. Supp.2d 35, 39, 47

(E.D.N.Y. 2005). They leave in place a system where the Guidelines are another of the

seven considerations spelled out in 18 U.S.S.C. § 3553(a) that courts are required to take

into account.

In discussing the type and degree of consideration that courts are required to give

to the Guidelines, in *United States v. Fleming*, 397 F.3d 95, 100 (2d Cir. 2005), the

Second Circuit noted

> that no specific verbal formulations should be prescribed to
> demonstrate the adequate discharge of the duty to "consider"
> matters relevant to sentencing. As long as the judge is aware of
> both the statutory requirements and the sentencing range or
> ranges that are arguably applicable, and nothing in the record
> indicates misunderstanding about such materials or
> misperception about their relevance, we will accept that the

31

requisite consideration has occurred. *Id.*[6]

Thus, while sentencing judges must still consider the Guidelines, there is no basis for treating the Guidelines as more controlling of the court's sentencing decision than any of the other factors the court must "consider" pursuant to §3553(a). *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005). *See United States v. Rattoballi*, 452 F.3d 127, 137 (2d Cir. 2006) ("[a] sentence must reflect consideration of the balance of the § 3553(a) factors; unjustified reliance upon any one factor is a symptom of an unreasonable sentence." *See also United States v. Fernandez*, 443 F.3d 19, 34-35 (2d Cir. 2006) ("we will not second guess the weight (or lack thereof) that the judge accorded to a given factor ... [under § 3553(a)], *as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented*" (emphasis added by Court in *Rattoballi*).

Similarly, the Court need not determine whether Mr. Rukoske is entitled to a "downward departure" because, as *Crosby* explained there is a distinction between a "departure" and a sentence outside the Guidelines range.

---

[6] The Court in *Crosby* did not eviscerate the substance of "consider" altogether:

> [i]n order to fulfill this statutory duty to "consider" the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range. A judge cannot satisfy this duty by a general reference to the entirety of the Guidelines Manual, followed by a decision to impose a "non-Guidelines sentence." 397 F.3d at 111.

> We think it advisable to refer to a sentence that is neither within the applicable Guidelines range nor imposed pursuant to the departure authority in the Commission's policy statements as a "non-Guidelines sentence" in order to distinguish it from the term "departure." A "departure," in the jurisprudence of the mandatory Guidelines regime, meant a sentence above or below the applicable Guidelines range when permitted under the standards governing departures. A "departure" was not a sentence within the applicable Guidelines range, but it was nonetheless a "Guidelines sentence," *i.e.*, imposed pursuant to the departure provisions of the policy statements in the Guidelines, as well as the departure authority of subsection 3553(b)(1).

*United States v. Crosby*, 397 F.3d at 112 n.9. *See also Booker*, 543 U.S. at 301 (Stevens, J., *dissenting in part*) ("there can be no 'departure' from a mere suggestion"); *United States v. Ranum*, 353 F. Supp.2d 984, 986-87 (E.D.Wis. 2005).

Moreover, in *Fernandez*, the Second Circuit, while "recogniz[ing] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances[,]" nevertheless "decline[d] to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable." 443 F.3d at 27, citing *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*) (explaining that "[w]e do not find it helpful to talk about the guidelines as 'presumptively' controlling or a guidelines sentence as '*per se* reasonable," because "[a]lthough making the guidelines 'presumptive' or '*per se* reasonable' does not make them mandatory, it tends in that direction; and anyway terms like 'presumptive' and '*per se*' are more ambiguous labels than they at first

33

appear"). *See also Rattoballi,* 452 F.3d at 133, *citing Crosby,* 397 F.3d at 115 ("we have

declined to adopt *per se* rules, opting instead to fashion the mosaic of reasonableness

through case-by-case adjudication").

The Second Circuit has also made it clear that the concept of "reasonableness" is a

flexible concept and accordingly it has declined

> to fashion any *per se* rules as to the reasonableness of every
> sentence within an applicable guideline or the unreasonableness
> of every sentence outside an applicable guideline. Indeed, such
> *per se* rules would risk being invalidated as contrary to the
> Supreme Court's holding in *Booker/Fanfan,* because they would
> effectively re-institute mandatory adherence to the Guidelines.
> *See Booker/Fanfan,* 543 U.S. at 312, 125 S.Ct. at 794 (Scalia, J.,
> dissenting in part). 397 F.3d at 115.

The Impact on Mr. Rutkoske's Children
Should be Considered as a Sentencing Factors

18 U.S.C. § 3553(a) lists the factors that a sentencing court is to consider when

imposing sentence. The second paragraph of the statute outlines in considerable detail

reasons for imposing any sentence but the first paragraph of the statute states only that the

court shall consider "the nature and circumstances of the offense and the history and

characteristics of the defendant." The statute codifies the essence of what sentencing

judges did for centuries before the federal sentencing guidelines were enacted. With the

guidelines rendered advisory, this task has been returned to the Court.

Mr. Rutkoske is an involved father with his twin 10 year old children, his

daughter, ██████ and his son, ██████ Returning Mr. Rutkoske to prison carries the risk

of detrimental impact on his children, especially on his son, ▉▉▉▉▉

> Prisoners' children have been variously referred to as the
> "orphans of justice," the "forgotten victims" of crime. Children
> can suffer a range of problems during their parent's
> imprisonment, such as depression, hyperactivity, aggressive
> behavior, withdrawal, regression, clinging behavior, sleep
> problems, running away, truancy and poor school grades.
> Murray, The effects of imprisonment on families and children
> of prisoners, 2005, page 446. (Internal citations omitted)

Studies have found that boys suffer more negative impacts from parental
imprisonment than is experienced by girls. *Id.* 452. It has also been reported that
reduction in recidivism spares children "the trauma of repeated separation, which, in turn,
will improve their psychological adjustment." Parke and Clarke-Stewart, Effects of
Parental Incarceration on Young Children, 2001.

Attached to this submission is a letter from Elizabeth Kirby, the principal of the
elementary school that ▉▉▉ and ▉▉▉ Rutkoske attend. Attached as Exhibit C. Ms.
Kirby describes the negative impact that Mr. Rutkoske's incarceration had on his
children. While their father was in prison the children became "sad, lethargic and
unresponsive. ▉▉▉ the most obviously effected." Since his return to their lives,
"▉▉▉ has totally changed." ▉▉▉ is now "happy, confident, eager, interested,
conversational, and successful. You can see it on his face when he walks down the hall.
He has had a total transformation now that his father is home."

A letter from the School Counselor, Michele Austin is attached as Exhibit D. Ms.
Austin observed both children "endure a tremendous amount of stress and uncertainly"

35

while their father was incarcerated. Ms. Austin noted that ▇▇▇▇'s had to deal with teasing from his classmates and that his learning disability "presented additional challenges that were even more difficult for him to overcome." Ms. Austin noticed a positive "change in ▇▇▇▇, when his father returned home."

Mr. Rutkoske's children are fortunate to have a loving and supportive mother but the absence of their father had a marked and negative impact on their lives. Returning Mr. Rutkoske to prison would exacerbate the harm to his children. From the children's perspective, returning their father to prison would have the same impact of a second conviction. It is respectfully submitted that in formulating a sentence for Mr. Rutkoske, that your Honor can and should consider the trauma to Mr. Rutkoske's children if he is returned to prison.

<u>Judicial Recommendation for Restoration of Civil Rights</u>

As noted in a number of letters previously submitted to the Court, Mr. Rutkoske has been involved in the sport of hunting his entire life. Clearly, as a convicted felon, Mr. Rutkoske cannot participate in any activity involving a fire arm. Under 18 U.S.C. § 921 (20), if Mr. Rutoske's civil rights are fully restored, he would be able to participate in hunting activities. The restoration of civil rights is a matter of state law. *Caron v United States*, 524 U.S. 308, 316 (1998). It is respectfully submitted that a judicial recommendation from your Honor that Mr. Rutkoske's civil rights be restored would be of great significance to the State officials making that decision. It is also respectfully

36

submitted that the restoration of Mr. Rutkoske's civil rights would be in accord with the restorative purposes of sentencing listed in 18 U.S.C. 3553(a)(2)(D).

**Conclusion**

The government has failed either to prove or to proffer any facts on which this Court could determine loss causation by the means required by the Second Circuit. Accordingly, it is respectfully submitted that there is no need for a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978). Mr. Rutkoske has effectively served a sentence of 21 months which is the bottom of the guideline range. If your Honor finds that Mr. Rutkoske's guideline level should not have been enhanced for his role in the offense, his guideline sentencing range would be 10 to 16 months, a sentence that he has long since completed. Finally, if your Honor considers the detrimental impact returning Mr. Rutkoske to prison will have on his children, it is respectfully submitted that a sentence of time served is sufficient but not greater than necessary to achieve the goals of sentencing outlines in 18 U.S.C. § 3553(a).

Dated:      New York, New York
            May 17, 2010

                              Respectfully submitted,

                              Andrew G. Patel
                              Attorney for David Rutkoske
                              111 Broadway, Suite 1305
                              New York, NY 10006
                              212-349-0230

37

**Affirmation of Service**

 I , Andrew G. Patel, an attorney admitted to practice before this Court swears
under penalties of perjury that on May 17, 2010 I placed a copy of the attached Pre-
Sentencing Memoranda in an envelope addressed to:

> Reed M. Brodsky
> Assistant United States Attorney
> One Saint Andrew's Plaza
> New York, NY 10007

and served that envelope on the security officer at the entrance to the United States
Attorney's Office.

Date:  New York, New York
   May 17, 2010

> Andrew G. Patel
> 111 Broadway, Suite 1305
> New York, NY 10006
> 212-349-0230